Sarah Spinuzzi (Bar No. 305658)
Email: sarah@coastkeeper.org
Erin Barlow (Bar No. 342212)
Email: erin@coastkeeper.org
ORANGE COUNTY COASTKEEPER
3151 Airway Avenue, Suite F-110
Costa Mesa, California 92626
Telephone: (714) 850-1965

*Attorneys for Plaintiff Orange County Coastkeeper*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

ORANGE COUNTY COASTKEEPER, a California nonprofit public benefit corporation,

Plaintiff,

v.

SHAPCO, INC., a California corporation; CUSTOM PIPE AND FABRICATION INC., a California Corporation; STANTON PARTNERSHIP; and DOES 1 through 5,

Defendants.

Civil Case No.

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**

**(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq*.)**

Orange County Coastkeeper ("Coastkeeper" or "Plaintiff"), by and through counsel, hereby alleges:

## I. JURISDICTION AND VENUE

1. Plaintiff brings this civil suit under the citizen suit enforcement provision of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 et seq. (the "Clean Water Act" or the "CWA"). See 33 U.S.C. § 1365.

2. This Court has subject matter jurisdiction over the parties and this action pursuant to 33 U.S.C. § 1365(a)(1) and 28 U.S.C. §§ 1331 and 2201 (an action for declaratory and injunctive relief arising under the Constitution and laws of the United States).

3. On June 28, 2024, Plaintiff issued a 60-day Notice of Violation and Intent To

Sue letter (the "Notice Letter"), attached hereto as Exhibit A and incorporated by reference herein, to Shapco, Inc. ("Shapco"), Custom Pipe and Fabrication Inc. ("Custom Pipe"), and Stanton Partnership ("Stanton Partnership") (collectively, "Defendants"), as the owner(s) and/or operator(s) of the Custom Pipe and Fabrication Inc. facility located at 10560 Fern Avenue, Stanton, CA 90680 (the "Facility"). The Notice Letter informed Defendants of the violations of the CWA, and California's General Permit for Discharges of Storm Water Associated with Industrial Activities (National Pollutant Discharge Elimination System ("NPDES") General Permit No. CAS000001, Water Quality Order No. 97-03-DWQ, as amended by Order No. 2014-0057-DWQ, as amended by Order No. 2015-0122-DWQ, as subsequently amended by Order No. 2018-0028-DWQ (effective July 1, 2020) (hereinafter, the "General Permit" or "Permit") at the Facility. The Notice Letter informed Defendants of Plaintiff's intent to file suit against Defendants to enforce the CWA and General Permit.

4. The Notice Letter was also sent to the Attorney General of the United States Department of Justice ("USDOJ"), the Administrator of the United States Environmental Protection Agency ("EPA"), the Regional Administrator of EPA Region 9, the Executive Director of the State Water Resources Control Board ("State Board"), and the Executive Officer of the Regional Water Quality Control Board, Santa Ana Region ("Regional Board"), as required by 40 C.F.R. § 135.2(a)(1) and Section 505(b) of the CWA, 33 U.S.C. § 1365(b)(1)(A).

5. More than sixty days have passed since the Notice Letter was sent via certified mail to Defendants and the State and Federal agencies. Plaintiff is informed and believes, and thereon alleges, that neither the EPA, USDOJ, nor the State of California have commenced or are diligently prosecuting an action to redress the violations alleged in the Notice Letter and in this complaint. *See* 33 U.S.C. § 1365(b)(1)(B). This action is not barred by any prior administrative penalty under Section 309(g) of the CWA. 33 U.S.C. § 1319(g).

6. Venue is proper in the Central District of California pursuant to Section

505(c)(1) of the CWA, 33 U.S.C. § 1365(c)(1), because the sources of the CWA and General Permit violations are located within this judicial district.

7. Plaintiff seeks relief for Defendants' substantive and procedural violations of the General Permit and the CWA resulting from industrial activities at the Facility.

## II. INTRODUCTION

8. This complaint seeks relief for the Defendants' unlawful discharges of pollutants into waters of the United States from industrial operations at the Facility. Specifically, Coastkeeper is informed and believes, and thereon alleges, that Defendants' discharges of polluted storm water and non-storm water from the Facility enter a storm drain that discharges into the Stanton Storm Channel, then to the Bolsa Chica Channel, then to the Anaheim Bay and Huntington Harbour, eventually draining to the Pacific Ocean (collectively, the "Receiving Waters"), in violation of the substantive and procedural requirements of the CWA and General Permit. These violations have been occurring since at least July 1, 2019, and are ongoing and continuous.

9. With every significant rainfall event, large amounts of polluted storm water originating from industrial operations such as the Facility pour into storm drains and local waterways. The consensus among regulatory agencies and water quality specialists is that storm water pollution accounts for a significant amount of the total pollution entering surface waters each year. These surface waters, known as receiving waters, are ecologically sensitive areas. These waters are essential habitat for dozens of fish and bird species, as well as macro-invertebrate and invertebrate species. Storm water and non-storm water contain sediment, heavy metals such as aluminum, iron, and zinc, as well as high concentrations of nitrate and nitrite, and other pollutants. Exposure to polluted storm water harms the special aesthetic and recreational significance that the surface waters have for people in the surrounding communities. The public's use of the surface waters exposes many people to toxic metals and other contaminants in storm water and non-storm water discharges. Non-contact recreational and aesthetic opportunities, such as wildlife observation, are also impaired by polluted discharges to surface waters such as the

Receiving Waters.

## III. PARTIES

### A. Orange County Coastkeeper

10. Orange County Coastkeeper is a nonprofit public benefit corporation organized under the laws of the State of California and has roughly 5,601 members. Orange County Coastkeeper's office is located at 3151 Airway Avenue, Suite F-110, Costa Mesa, California 92626.

11. Orange County Coastkeeper is dedicated to the protection of swimmable, drinkable, fishable water, and the promotion of watershed resilience throughout Orange County. To further these goals, Orange County Coastkeeper actively seeks federal and state agency implementation of the CWA, and, where necessary, directly initiates enforcement actions on behalf of itself and its members.

12. Members of Orange County Coastkeeper live and own homes in the Anaheim Bay/Huntington Harbour watershed, and use and enjoy the waters into which the Facility discharges polluted storm water. Members of Orange County Coastkeeper use these waterways to participate in a variety of water sports and other activities including, fishing, swimming, boating, kayaking, bird watching, viewing wildlife, hiking, biking, surfing, wading, standup paddle boarding, walking, running, and engaging in scientific study, including monitoring, restoration, and research activities. The discharge of pollutants from the Facility harms Coastkeeper's members by negatively impacting their use and enjoyment of the receiving waters.

13. Defendants' failure to comply with the procedural and substantive requirements of the CWA and General Permit, including discharging polluted storm water from the Facility, failing to report such pollution, and failing to improve the quality of storm water discharges from the Facility in accordance with the General Permit, degrades water quality and harms aquatic life in the Receiving Waters. Further, such actions and/or inaction, impairs Orange County Coastkeeper members' use and enjoyment of those Receiving Waters, thus giving Plaintiff standing on behalf of its members. Defendants'

failure to comply with the procedural requirements of the CWA and General Permit means that Coastkeeper's members are unable to obtain statutorily required information on Defendants' storm water, and storm water management practices. Thus, Plaintiff faces both informational harm and informational injury because the CWA and General Permit provide a right to information, but Defendants have often failed to provide such information, as detailed below. Further, such informational harm and injury gives Plaintiff standing on behalf of its members.

14. The violations of the CWA and General Permit at the Facility are ongoing and continuous. Thus, the interests of Coastkeeper's members have been, are being, and will continue to be adversely affected by Defendants' failure to comply with the CWA and General Permit. The relief sought herein will redress the harms to Plaintiff's members caused by Defendants' activities.

15. Continuing commission of the acts and omissions alleged herein will irreparably harm Plaintiff's members, for which harm they have no plain, speedy, or adequate remedy at law.

**B. The Owners and/or Operators of the Facility**

16. Custom Pipe is the current operator of the Facility, and has been the operator of the Facility at all times relevant to this complaint, and is a responsible party under the CWA.

17. Coastkeeper is informed and believes, and thereon alleges, that Shapco is the parent company to Custom Pipe, and is therefore also considered an operator and/or owner.

18. Coastkeeper is informed and believes, and thereon alleges, that Custom Pipe and Shapco are both active California corporations, registered and authorized to do business in California.

19. Coastkeeper is informed and believes, and thereon alleges, that Stanton Partnership is the owner of the real property underlying the Facility.

20. Property owners with knowledge and control of the activities giving rise to a

CWA claim are liable for those violations over which they had knowledge and control.

21. Coastkeeper is informed and believes, and thereon alleges, that Stanton Partnership has a lease agreement or other contractual relationship with Custom Pipe and/or Shapco that gives Stanton Partnership knowledge and control over the acts and omissions giving rise to the violations alleged in this complaint.

22. Coastkeeper is informed and believes, and thereon alleges, that Jerry A. Witkow, located at 1666 20th Street, Suite 100, Santa Monica, CA 90404, is the agent for service of process for Stanton Partnership, Custom Pipe, and Shapco, which indicates that Stanton Partnership may share other corporate officers with Custom Pipe and Shapco, thus giving Stanton Partnership knowledge and control over the acts and omissions giving rise to the violations alleged in this complaint.

23. Coastkeeper is informed and believes, and thereon alleges, that Todd Kalau is Custom Pipe's Plant Manager, the Facility Contact identified by Custom Pipe in its Notice of Intent ("NOI") for coverage under the General Permit, and is also identified as the Legally Responsible Person in the Facility's Storm Water Pollution Prevention Plan ("SWPPP").

## IV. LEGAL BACKGROUND

### A. The Clean Water Act

24. Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States unless the discharge complies with various enumerated sections of the CWA. Among other things, section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to section 402 of the CWA, 33 U.S.C. §§ 1311(a) and 1342(b).

25. Section 301(b) of the CWA requires that all point source dischargers, including those discharging polluted storm water, must achieve technology-based effluent limitations by utilizing Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. *See* 33 U.S.C. § 1311(b).

26. The CWA requires point source discharges of pollutants to navigable waters be regulated by an NPDES permit. 33 U.S.C. § 1311(a); *see* 40 C.F.R. § 122.26(c)(1).

27. The "discharge of a pollutant" means, among other things, "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12); *see* 40 C.F.R. § 122.2.

28. The term "pollutant" includes "dredged spoil, solid waste… rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water." 33 U.S.C. § 1362(6); *see* 40 C.F.R. § 122.2.

29. The term "point source" means any "discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." 33 U.S.C. § 1362(14); *see* 40 C.F.R. § 122.2.

30. "Waters of the United States" are defined as "navigable waters" and "waters which are currently used, or were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide." 33 U.S.C. § 1362(7); 40 C.F.R. § 120.2.

31. The EPA promulgated regulations defining "waters of the United States." *See* 40 C.F.R. § 120.2. The EPA interprets waters of the United States to include not only traditionally navigable waters, but also other waters, including waters tributary to navigable waters, and wetlands adjacent to navigable waters. *Id.*

32. Section 505(a)(1) and Section 505(f) of the CWA provide for citizen enforcement actions against any "person" who is alleged to be in violation of an "effluent standard or limitation . . . or an order issued by the Administrator or a State with respect to such a standard or limitation." 33 U.S.C. §§ 1365(a)(1); *see* 1365(f).

33. Defendants are "persons" within the meaning of Section 502(5) of CWA. *See* 33 U.S.C. § 1362(5).

34. An action for injunctive relief is authorized under Section 505(a) of the

CWA. *See* 33 U.S.C. § 1365(a).

35. Each separate violation of the CWA subjects the violator to a penalty of up to $66,712 per day per violation for all violations that occurred after November 2, 2015, and were assessed on or after December 27, 2023. *See* 33 U.S.C. §§ 1319(d) and 1365(a); Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4.

36. Section 505(d) of the CWA, 33 U.S.C. § 1365(d), permits prevailing or substantially prevailing parties to recover litigation costs, including attorneys', experts', and consultants' fees.

**B. The General Permit**

37. Section 402(p) of the CWA establishes a framework for regulating industrial storm water discharges under the NPDES program. 33 U.S.C. § 1342(p).

38. States with approved NPDES permit programs are authorized by Section 402(p) to regulate industrial storm water discharges through individual permits issued to dischargers and/or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers. 33 U.S.C § 1342.

39. California is a state authorized by the EPA to issue NPDES permits.

40. In California, the State Board and nine regional water boards are charged with regulating pollutants to protect California's water resources and improve water quality. *See* Cal. Water Code § 13001.

41. The General Permit is a statewide NPDES permit issued by the State Board pursuant to the CWA.

42. The General Permit was issued on July 1, 2015, pursuant to Order No. 2014-0057-DWQ.

43. On November 6, 2018, the State Board amended the General Permit with Order No. 2015-0122-DWQ, incorporating: 1) Federal Sufficiently Sensitive Test Method Ruling; 2) TMDL Implementation Requirements; and 3) Statewide Compliance Options Incentivizing On-Site or Regional Storm Water Capture and Use.

44. In order to lawfully discharge storm water to waters of the United States in

California, industrial dischargers must secure coverage under the General Permit and comply with its terms, or obtain and comply with an individual NPDES permit. *See* General Permit Finding 12.

45. Prior to beginning industrial operations, dischargers are required to apply for coverage under the General Permit by submitting a Notice of Intent to Comply with the Terms of the General Permit to Discharge Storm Water Associated with Industrial Activity ("NOI") to the State Board. *See* Storm Water Permit, Finding 17.

46. Violations of the General Permit are violations of the Clean Water Act. *See* General Permit, Section XXI.A (Duty to Comply).

### C. The General Permit's Discharge Prohibitions And Technology-Based Effluent Limitations

47. The General Permit contains certain absolute prohibitions. The General Permit prohibits the direct or indirect discharge of materials other than storm water ("non-storm water discharges," or "NSWDs"), which are not otherwise authorized by an NPDES permit, to the waters of the United States. *See* General Permit, Discharge Prohibition III.B.

48. The General Permit's Effluent Limitations require dischargers covered by the General Permit to reduce or prevent pollutants associated with industrial activity in storm water discharges through the implementation of Best Available Technology Economically Achievable ("BAT") for toxic or non-conventional pollutants, and Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. Toxic pollutants are listed at 40 C.F.R. § 401.15 and include copper, lead, and zinc, among others. Conventional pollutants are listed at 40 C.F.R. § 401.16 and include biochemical oxygen demand ("BOD"), total suspended solids ("TSS"), oil and grease ("O&G"), pH, and fecal coliform. *See* General Permit, Effluent Limitation V.A.

49. Pursuant to the CWA and the General Permit, dischargers must employ Best Management Practices ("BMPs") that constitute BAT and BCT to reduce or eliminate storm water pollution. 33 U.S.C. § 1311(b); General Permit, Effluent Limitation V.A.

50. EPA's NPDES Storm Water Multi-Sector General Permit for Industrial

Activities ("MSGP") includes numeric benchmarks for pollutant concentrations in storm water discharges ("EPA Benchmarks"), which are, in part, incorporated into the General Permit via the Table 2 Numeric Action Levels ("NALs"). *See* General Permit, Monitoring, Sampling and Analysis, XI.B.

51. EPA Benchmarks/NALs provide an objective standard to determine whether a facility's BMPs are successfully developed and/or implemented and achieve compliance with BAT and BCT standards. General Permit, Effluent Limitation V.A.

52. EPA Benchmarks/NALs for the following parameters are as follows: pH – 6.0 – 9.0 standard units; TSS – 100 mg/L; zinc – 0.26 mg/L; iron – 1.0 mg/L; nitrate plus nitrate as nitrogen ("N+N") – 0.68 mg/L; O&G – 15 mg/L; and aluminum – 0.75 mg/L. General Permit, Monitoring, Sampling and Analysis, Table 2.

53. Discharges from an industrial facility containing pollutant concentrations that exceed NALs indicate that BMPs that meet BAT for toxic and non-conventional pollutants and/or BCT for conventional pollutants have not been developed and/or implemented at the Facility. General Permit, Effluent Limitation V.A.

**D. The General Permit's Receiving Water Limitations**

54. The CWA and the General Permit's Receiving Water Limitations prohibit storm water discharges and unauthorized non-storm water discharges that cause or contribute to an exceedance of any applicable Water Quality Standards ("WQS"). *See* 33 U.S.C. § 1311(b)(1)(C); 40 C.F.R. §§122.4(d), 122.4(i), 122.44(d); General Permit, Receiving Water Limitation VI.A.

55. WQS establish the water quality goals for a water body. *See* 40 C.F.R. §131.2.

56. WQS are pollutant concentration levels determined by the State Board, the various regional boards, and the EPA to be protective of the beneficial uses of the waters that receive polluted discharges.

57. Discharges not meeting WQS can cause or contribute to the impairment of beneficial uses of the waters that receive polluted discharges.

58. The State of California regulates water quality through the State Board and nine regional boards. Each regional board maintains a separate water quality control plan, called a basin plan, which contains WQS for waterbodies within its geographical area.

59. The Santa Ana Regional Board adopted the Basin Plan for the Santa Ana Region (the "Santa Ana Basin Plan" or the "Basin Plan"). The Santa Ana Basin Plan identifies the "Beneficial Uses" of water bodies within the region. The Basin Plan identifies the Beneficial Uses for Huntington Harbour to include: Navigation; Water Contact Recreation; Non-contact Water Recreation; Commercial and Sport Fishing; Wildlife Habitat; Rare, Threatened or Endangered Species; Spawning, Reproduction, and Development; and Marine Habitat. *See* Santa Ana Basin Plan at Table 3-1. The beneficial uses for Anaheim Bay, Outer Bay include: Navigation; Water Contact Recreation; Non-contact Water Recreation; Preservation of Biological Habitats of Special Significance; Wildlife Habitat; Rare, Spawning, Reproduction, and Development; and Marine Habitat. *Id*. Additionally, the beneficial uses for Anaheim Bay, Seal Beach National Wildlife Refuge include: Water Contact Recreation; Non-contact Water Recreation; Preservation of Biological Habitats of Special Significance; Wildlife Habitat; Rare, Spawning, Reproduction, and Development; Marine Habitat; and Estuarine Habitat. *Id*. Beneficial uses for Bolsa Bay include: Water Contact Recreation; Non-contact Water Recreation; Commercial and Sport Fishing; Preservation of Biological Habitats of Special Significance; Wildlife Habitat; Rare, Spawning, Reproduction, and Development; Marine Habitat; and Shellfish Harvesting. *Id*. Lastly, beneficial uses for Bolsa Chica Ecological Reserve include: Water Contact Recreation; Non-contact Water Recreation; Preservation of Biological Habitats of Special Significance; Wildlife Habitat; Rare, Spawning, Reproduction, and Development; Marine Habitat; and Estuarine Habitat. *Id*.

60. Surface waters that cannot support the Beneficial Uses of those waters listed in the basin plans are designated as impaired water bodies pursuant to Section 303(d) of the Clean Water Act, 33 U.S.C. § 1313(d).

61. According to the 303(d) List of Impaired Water Bodies, the Bolsa Chica

Channel is impaired for ammonia, pH, and indicator bacteria, Huntington Harbour is impaired for chlordane, copper, PCBs, toxicity, lead, and indicator bacteria, and Anaheim Bay is impaired for nickel, toxicity, and PCBs. Polluted discharges from industrial sites, such as the Facility, contribute to the degradation of these already-impaired surface waters and aquatic-dependent wildlife that depend on these waters. These contaminated discharges can and must be controlled for these aquatic ecosystems to regain their health.

62. Discharges of polluted storm water to the Receiving Waters pose threats to the public, dramatically affect the use and enjoyment of the surrounding environment, and adversely affect the aquatic environment.

63. Discharges of pollutants at levels above WQS, like those from the Facility, cause or contribute to the impairment of the Beneficial Uses of the Receiving Waters.

64. WQS may be either numeric or narrative objectives. Applicable WQS include the water quality objectives in the Basin Plan, and the Criteria for Priority Toxic Pollutants in the State of California ("CTR"), 40 C.F.R. § 131.38.

65. The Santa Ana Basin Plan provides that "[t]he pH of inland surface waters shall not be raised above 8.5 or depressed below 6.5 as a result of controllable water quality factors." Basin Plan, Water Quality Objectives.

66. The Basin Plan also includes narrative toxicity standards which state: "[t]oxic substances shall not be discharged at levels that will bioaccumulate in aquatic resources to levels which are harmful to human health." *Id*. Further, "[t]he concentrations of toxic pollutants in the water column, sediments or biota shall not adversely affect beneficial uses." *Id*.

67. The CTR establishes numeric WQS to protect human health and the environment in the State of California. The numeric WQS established in the CTR for zinc is 0.12 mg/L, and copper is 0.013 mg/L, assuming a water hardness calculation of 100 mg/L. 40 C.F.R. § 131.38.

68. The CTR numeric limits are expressed as dissolved metal concentrations.

69. Discharges with pollutant levels that cause or contribute to an exceedance of the CTR criteria, the Basin Plan standards, and/or other applicable WQS in the Receiving Waters are violations of Receiving Water Limitation Section VI.A. of the General Permit.

70. The General Permit's Receiving Water Limitations prohibit storm water discharges from adversely impacting human health or the environment. *See* General Permit, Section VI.B.

71. Storm water discharges with pollutant levels that exceed levels known to adversely impact aquatic species and the environment are violations of Receiving Water Limitation Section VI.B. of the General Permit.

**E. The General Permit's Storm Water Pollution Prevention Plan Requirements**

72. Dischargers must develop and implement a SWPPP prior to conducting, and in order to continue, industrial activities. General Permit, Sections I.J. (Finding 68), and X.B. The SWPPP must meet all of the requirements of the General Permit. General Permit, Sections X.A-H.; *see also* General Permit, Appendix 1. The SWPPP must identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water and authorized non-storm water discharges from the facility. General Permit, Section X.G.

73. The SWPPP must identify and implement site-specific BMPs to reduce or prevent pollutants associated with industrial activities in storm water and authorized non-storm water discharges. General Permit, Section X.H. The SWPPP must include BMPs that achieve pollutant discharge reductions attainable via BAT and BCT. General Permit, Section I.D. (Finding 32), Section X.C.

74. The SWPPP must include: a narrative description and summary of all industrial activity; potential sources of pollutants, and potential pollutants; a site map indicating the storm water conveyance system, associated points of discharge, direction of flow, areas of actual and potential pollutant contact, including the extent of pollution-

generating activities, nearby water bodies, and pollutant control measures; a description of storm water management practices; a description of the BMPs to be implemented to reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges; the identification and elimination of non-storm water discharges; the location where significant materials are being shipped, stored, received, and handled, as well as the typical quantities of such materials and the frequency with which they are handled; a description of dust and particulate-generating activities; and an identification and description of individuals and their current responsibilities for developing and implementing the SWPPP. General Permit, Section X.

75. The objectives of the SWPPP are to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges, to identify and implement site-specific BMPs to prevent the exposure of pollutants to storm water, and to reduce or prevent the discharge of polluted storm water from industrial facilities. General Permit, Section X.

76. The General Permit requires the discharger to evaluate the SWPPP on an annual basis and revise it as necessary to ensure compliance with the General Permit. General Permit, Sections X.A-B. The General Permit also requires that the discharger conduct an annual comprehensive site compliance evaluation that includes a review of all visual observation records, inspection reports, sampling and analysis results, a visual inspection of all potential pollutant sources for evidence of, or the potential for, pollutants entering the drainage system, a review and evaluation of all BMPs to determine whether the BMPs are adequate, properly implemented and maintained, or whether additional BMPs are needed, and a visual inspection of equipment needed to implement the SWPPP. General Permit, Sections X.B. and XV.

77. The SWPPP and site map(s) must be assessed annually and revised as necessary to ensure accuracy and effectiveness. General Permit, Sections I.J. (Finding 68), X.B.

**F. The General Permit's Monitoring Implementation Program Requirements**

78. The General Permit requires permittees to develop and implement a storm water Monitoring Implementation Program ("MIP") and include it in the SWPPP prior to conducting, and in order to continue, industrial activities. General Permit, Sections X.I. and XI.

79. The General Permit requires facility owners and/or operators to develop and implement an adequate MIP that meets all of the requirements of the General Permit. General Permit Sections X.I. and XI.A-D.

80. The objective of the MIP is to detect and measure the concentrations of pollutants in a facility's discharge and to ensure compliance with the General Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. *See* General Permit, Section XI.

81. An adequate MIP ensures that BMPs are effectively reducing and/or eliminating pollutants from the facility's discharges, and the MIP is evaluated and revised whenever appropriate to ensure compliance with the General Permit. *See id*.

82. The General Permit requires facility operators to monitor and sample storm water discharges to ensure that the facility is complying with the terms of the General Permit. General Permit, Section XI.B.

83. Section XI.A.1 of the General Permit requires dischargers to conduct monthly visual observations during dry weather of each drainage area. Monthly visual observations must include observations of any non-storm water discharges, all outdoor industrial equipment and activities, BMPs, and all potential sources of pollution. *Id*.

84. Section XI.A.2 of the General Permit requires dischargers to conduct visual observations at the same time sampling occurs at a discharge location, and document the presence of any floating and suspended materials, oil and grease, discolorations, turbidity, odors, and the source of any pollutants in storm water discharges from the facility.

85. Dischargers are required to maintain records of observations, observation

dates, discharge locations observed, and responses taken to reduce or prevent pollutants from contacting storm water discharges. *See* General Permit, Section XI.A.3.

86. The General Permit requires dischargers to visually observe and collect samples of storm water discharges from all locations where storm water is discharged. General Permit Section XI.B.4.

87. Section XI.B.1 of the General Permit defines a Qualifying Storm Event ("QSE") as a precipitation event that produces a discharge for at least one drainage area, and is preceded by forty-eight hours with no discharge from any drainage area.

88. The General Permit requires dischargers to collect and analyze storm water samples from two QSEs within the first half of each reporting year (July 1 to December 31), and two QSEs within the second half of each reporting year (January 1 to June 30). General Permit, Section XI.B.2. Each sample must be analyzed for TSS, pH, O&G, and additional parameters identified on a facility-specific basis that serves as indicators of the presence of all industrial pollutants identified in the pollutant source assessment—in addition to those required under the Standard Industrial Classification ("SIC") code. General Permit, Section XI.B.6.

89. Table 1 of the General Permit requires dischargers with SIC code 3498 (Fabricated Pipe and Pipe Fittings) to analyze samples for zinc, N+N, iron, and aluminum.

90. Section XI.B.6.c of the General Permit requires dischargers to analyze samples for pollutants associated with industrial operations.

91. Section XI.B.6.f of the General Permit requires dischargers to analyze additional parameters required by the Regional Board.

92. Section XI.B.6.e of the General Permit also requires dischargers to analyze storm water samples for additional applicable industrial parameters related to receiving waters with 303(d) listed impairments, or approved TMDLs.

93. Section XI.B.11 of the General Permit, among other requirements, provides that permittees must submit all sampling and analytical results for all samples via Storm Water Multiple Application & Report Tracking System ("SMARTS") within thirty days of obtaining all results for each sampling event.

**G. The General Permit's Exceedance Response Actions Requirements**

94. Under the General Permit, facility operators are required to perform Exceedance Response Actions ("ERAs") as appropriate whenever sampling indicates NAL exceedances. *See* General Permit, Section XII.

95. An annual NAL exceedance occurs when the average of all the analytical results for a parameter from samples taken within a reporting year exceeds the annual NAL value for that parameter. General Permit, Section XII.A.1.

96. An instantaneous maximum NAL exceedance occurs when two or more analytical results from samples taken for any single parameter within a reporting year exceed the instantaneous maximum NAL value or are outside of the instantaneous maximum NAL range for pH. General Permit, Section XII.A.

97. Upon receiving NOI coverage, all permittees are placed in "Baseline status." General Permit, Section XII.B.

98. A permittee's Baseline status for any given parameter changes to "Level 1 status" if sampling results indicate a NAL exceedance for that same parameter. General Permit, Section XII.C.

99. Level 1 status commences on July 1 following the reporting year during which the exceedance(s) occurred. General Permit, Section XII.C.

100. By October 1 following commencement of Level 1 status, permittees are required to: complete an evaluation, with the assistance of a Qualified Industrial Stormwater Practitioner ("QISP"), of the industrial pollutant sources at the facility that are or may be related to the NAL exceedance(s); and identify in the evaluation the corresponding BMPs in the SWPPP and any additional BMPs and SWPPP revisions necessary to prevent future NAL exceedances and to comply with the requirements of the

General Permit. General Permit, Sections XII.C.1.a-c.

101. Although the evaluation may focus on the drainage areas where the NAL exceedance(s) occurred, all drainage areas shall be evaluated. General Permit, Section XII.C.1.c.

102. Based upon the Level 1 status evaluation, the permittee is required to, as soon as practicable but no later than January 1 following commencement of Level 1 status, revise the SWPPP as necessary and implement any additional BMPs identified in the evaluation, certify and submit via SMARTS a Level 1 ERA Report prepared by a QISP that includes a summary of the Level 1 ERA Evaluation and a detailed description of the SWPPP revisions and any additional BMPs for each parameter that exceeded an NAL. General Permit, Sections XII.C.2.a.i-ii.

103. The permittee in Level 1 status must also certify and submit via SMARTS the QISP's identification number, name, and contact information (telephone number, e-mail address) no later than January 1 following commencement of Level 1 status. General Permit, Section XII.C.2.a.iii.

104. A permittee's Level 1 status for a parameter will return to Baseline status once a Level 1 ERA Report has been completed, all identified additional BMPs have been implemented, and results from four consecutive QSEs that were sampled subsequent to BMP implementation indicate no additional NAL exceedances for that parameter. General Permit, Section XII.C.2.b.

105. A permittee's Level 1 status for any given parameter shall change to Level 2 status if sampling results indicate a NAL exceedance for that same parameter while the discharger is in Level 1. General Permit, Section XII.D.

106. Level 2 status commences on July 1 following the reporting year during which the NAL exceedance(s) occurred. General Permit, Section XII.D.

107. A discharger in Level 2 status shall submit a Level 2 ERA Action Plan prepared by a QISP that addresses each new Level 2 NAL exceedance by January 1 following the reporting year during which the NAL exceedances occurred. General

Permit, Section XII.D.1.a.

108. On January 1 of the reporting year following the submittal of the Level 2 ERA Action Plan, a discharger shall certify and submit a Level 2 ERA Technical Report prepared by a QISP to SMARTS that includes one or more of the following demonstrations: (a) Industrial Activity BMPs Demonstration; (b) Non-Industrial Pollutant Source Demonstration; and/or, (c) Natural Background Pollutant Source Demonstration. General Permit, Section XII.D.2.

109. Dischargers with Level 2 status are required to annually update their Level 2 ERA Technical Reports based upon additional NAL exceedances of the same parameter and same drainage area, facility operational changes, pollutant source(s) changes, and/or information that becomes available via compliance activities. General Permit, Section XII.D.3.c.

110. Dischargers with Level 2 status who submit one of the above demonstrations and have implemented BMPs to prevent future NAL exceedance(s) for the Level 2 parameter(s) shall return to baseline status for that parameter, if results from four subsequent consecutive QSEs sampled indicate no additional NAL exceedance(s) for that parameter(s). General Permit, Section XII.D.4.a.

111. If future NAL exceedances occur for the same parameter(s), the Discharger's Baseline status will return to Level 2 status on July 1 in the subsequent reporting year during which the NAL exceedance(s) occurred. *Id*.

**H. The General Permit's Annual Reporting Requirements**

112. Section XVI of the General Permit requires dischargers to submit an Annual Report to the Regional Board by July 15 of each year.

113. The Annual Report must include a Compliance Checklist that indicates whether a discharger has complied with all of the applicable requirements of the General Permit, an explanation for any non-compliance of requirements within the reporting year, an identification, including page numbers and/or sections, of all revisions made to the SWPPP within the reporting year, and the date(s) of the Annual Evaluation. General

Permit, Section XVI.

## V. FACTUAL BACKGROUND

### A. The Facility's General Permit Coverage

114. Plaintiff is informed and believes, and thereon alleges, that on or about February 24, 1998, Custom Pipe obtained General Permit coverage for the Facility by submitting an NOI to the State Board.

115. Plaintiff is informed and believes, and thereon alleges, that the Facility's NOI identifies the operator of the facility located at 10560 Fern Avenue, Stanton, CA 90680 (the "Custom Pipe NOI") as Custom Pipe & Fabrication Inc.

116. Plaintiff is informed and believes, and thereon alleges, that the Custom Pipe NOI lists the Facility as 5 acres in size, with all of the industrial area exposed to storm water.

117. Plaintiff is informed and believes, and thereon alleges, that the Waste Discharger Identification ("WDID") number listed on the Custom Pipe NOI is 8 30I009856.

118. Plaintiff is informed and believes, and thereon alleges, that the Custom Pipe NOI indicates that 98% of the Facility is impervious, with roughly 56% of the impervious area consisting of buildings or covered areas, while the remaining 2% of the site is comprised of unpaved or landscaped areas that do not impact storm water.

119. Plaintiff is informed and believes, and thereon alleges, that the Facility's operating hours, per the Facility SWPPP, are Monday through Friday from 6:30 AM to 4:00 PM.

120. Plaintiff is informed and believes, and thereon alleges, that the Facility's NOI lists Stanton Storm Channel as the Facility's receiving water.

121. SMARTS lists the Facility's coverage under the General Permit as "Active."

122. The Custom Pipe NOI lists the SIC code for the Facility as 3498 (Fabricated Pipe and Pipe Fittings), and the SWPPP also indicates that SIC code 5051 (Metals Service Centers and Offices) applies.

123. Plaintiff is informed and believes, and thereon alleges, that based on Custom Pipe's 3498 SIC code, the Facility is required to sample storm water for TSS, O&G, pH, zinc, iron, aluminum, and nitrate + nitrite nitrogen (N+N) based on the General Permit and SIC code requirement. General Permit, Section XI.B.6.

124. Further, since the Facility SWPPP indicates that forklifts are used at the Facility, and since forklifts shed copper, copper is a pollutant associated with industrial activities at the Facility, for which the Facility should be testing for in its storm water.

**B. Industrial Activities and Pollutant Sources at the Facility**

125. Plaintiff is informed and believes, and thereon alleges, that the Facility's primary industrial purpose is pipe and pipe fitting fabrication.

126. Plaintiff is informed and believes, and thereon alleges, that the primary industrial processes at the Facility include CNC milling, cutting, flanging, grinding, plasma cutting, some hand painting with brush applied coatings, and welding.

127. Plaintiff is informed and believes, and thereon alleges, that areas of industrial activity and industrial activities at the Facility include outdoor production, indoor production, covered work area(s), indoor storage, outdoor storage, loading/unloading area(s), hazardous materials storage, facility support equipment, cutting/welding/grinding, plasma cutting, dumpsters, scrap metal bins/roll-offs, and air compressors.

128. Plaintiff is informed and believes, and thereon alleges, that the Facility's ancillary operations include machine maintenance, housekeeping, sales, and administrative activities.

129. Plaintiff is informed and believes, and thereon alleges, that industrial materials and equipment are stored outside without adequate cover or containment.

130. Plaintiff is informed and believes, and thereon alleges, that Defendants have not properly developed and/or implemented the required BMPs to address the pollutant sources and associated pollutants at the Facility.

131. BMPs are necessary at the Facility to prevent the exposure of pollutants to precipitation and the subsequent discharge of polluted storm water and/or unauthorized

non-storm water from the Facility during rain events.

132. Plaintiff is informed and believes, and thereon alleges, that due to the issues listed in Paragraphs 129-131 above, discharges of polluted storm water and unauthorized non-storm water are caused when materials are leaked, tracked, spilled, carried by the wind, or carried by other non-storm water discharges from the Facility, into the street, storm drain, and, ultimately, into the Receiving Waters.

133. Plaintiff is informed and believes, and thereon alleges, that pollutants have been and continue to be tracked throughout the Facility by vehicles and machinery, which is tracked to areas of exposure and then outside of the Facility.

134. Plaintiff is informed and believes, and thereon alleges, that pollutants that are tracked outside the Facility enter the street, storm drain, and then are carried to the Receiving Waters by non-storm water discharges, such as high pressure or power washing activities or other means.

135. Plaintiff is informed and believes, and thereon alleges, that the areas of industrial activity and industrial activities at the Facility are sources of pollutants.

136. Plaintiff is informed and believes, and thereon alleges, that illegal discharges of polluted storm water and non-storm water negatively impact Plaintiff's members' use and enjoyment of the Receiving Waters by degrading the quality of the Receiving Waters and by posing risks to human health and aquatic life.

**C. The Facility's Storm Water Flow, Sampling Points, and Discharges to the Receiving Waters**

137. Plaintiff is informed and believes, and thereon alleges, that the Facility contains roof drainage and sheet flow runoff that takes place in paved areas and driveways between the Facility buildings.

138. Plaintiff is informed and believes, and thereon alleges, that the Facility has at least one discharge point and two storm water sampling locations.

139. Plaintiff is informed and believes, and thereon alleges, that the Facility's discharges flow to the street, where they flow into the municipal storm drain system

through curbside inlets, and once inside the municipal system, discharges into the Stanton Storm Channel, then to the Bolsa Chica Channel, then to Anaheim Bay/Huntington Harbour, and then to the Pacific Ocean.

140. Plaintiff is informed and believes, and thereon alleges, that Stanton Storm Channel and Bolsa Chica Channel are tributary to Anaheim Bay and Huntington Harbour with a relatively permanent surface connection thereto, and that Anaheim Bay and Huntington Harbour are navigable-in-fact and subject to the ebb and flow of the tide, and thus are navigable waters of the United States.

**D. Defendants' Violations of the Storm Water Permit's Technology-Based Effluent Limitations**

141. Plaintiff is informed and believes, and thereon alleges, that BMPs that achieve BAT/BCT have not been implemented at the Facility.

142. Plaintiff is informed and believes, and thereon alleges, that storm water discharges from the Facility contain concentrations of pollutants associated with the Facility's industrial activities above benchmark levels established by the EPA and incorporated into the General Permit.

143. Plaintiff is informed and believes, and thereon alleges, that storm water discharges from the Facility contain concentrations of pollutants with exceedances of NALs for TSS, O&G, aluminum, iron, zinc, and N+N.

144. Plaintiff is informed and believes, and thereon alleges, that for the 2018-2019 reporting year, the Facility exceeded NALs for iron and zinc.

145. Plaintiff is informed and believes, and thereon alleges, that for the 2020-2021 reporting year, the Facility exceeded the NAL for zinc.

146. Plaintiff is informed and believes, and thereon alleges, that for the 2021-2022 reporting year, the Facility exceeded the NALs for iron, zinc, and N+N.

147. Plaintiff is informed and believes, and thereon alleges, that for the 2022-2023 reporting year, the Facility exceeded the NAL for zinc.

148. Plaintiff is informed and believes, and thereon alleges, that for the 2023-2024

reporting year, the Facility exceeded the NALs for TSS, O&G, aluminum, iron, zinc, and N+N.

149. Plaintiff is informed and believes, and thereon alleges, that the ongoing exceedances of NALs demonstrate that Defendants have failed and continues to fail to develop and/or implement BMPs at the Facility as required to achieve compliance with the BAT/BCT standards in order to prevent the exposure of pollutants to storm water and to prevent discharges of polluted storm water from the Facility.

150. Plaintiff is informed and believes, and thereon alleges, that the technology based effluent limitations of the General Permit are violated each day that BMPs achieving these technology-based effluent limitations are not in place at the Facility.

151. Each day that Defendants have failed to develop and implement BAT and BCT at the Facility in violation of the General Permit is a separate and distinct violation of the CWA.

152. Defendants have been in violation of the BAT and BCT requirements at the Facility every day since at least July 1, 2019.

153. Defendants are liable for daily violations of the General Permit's technology based effluent limitations, every day since at least July 1, 2019.

**E. Defendants' Violations of the General Permit's Receiving Water Limitations**

154. Plaintiff is informed and believes, and thereon alleges, that the Facility's discharges include concentrations of metals and other pollutants that cause or contribute to exceedances of WQS in the Receiving Waters, including those WQS laid out in the CTR and Santa Ana Basin Plan.

155. Plaintiff is informed and believes, and thereon alleges, that each time polluted storm water discharges from the Facility in excess of an applicable CTR value, Defendants violate Receiving Water Limitation VI.A of the General Permit and Section 301(a) of the CWA, 33 U.S.C. § 1311(a), to not cause or contribute to an exceedance of any applicable WQS in the Receiving Waters.

156. Plaintiff is informed and believes, and thereon alleges, that storm water samples collected by Plaintiff demonstrate that discharges from the Facility contain concentrations of zinc that cause or contribute to a violation of an applicable WQS in the CTR. For example, the storm water sample collected by Plaintiff on February 24, 2023, contained zinc at .75 mg/L, which exceeds the CTR value of .12 mg/L.

157. Plaintiff is informed and believes, and thereon alleges, that storm water samples collected at the Facility demonstrate that discharges from the Facility contain pH values that cause or contribute to a violation of the applicable WQS in the Basin Plan which is 6.5 to 8.5 standard units for inland surface waters.

158. Plaintiff is informed and believes, and thereon alleges, that storm water samples collected by both Defendants and Coastkeeper demonstrate pH levels outside the Basin Plan's WQS, thus demonstrating that the Facility is causing or contributing to an exceedance of an applicable WQS in the Receiving Waters.

159. Plaintiff is informed and believes, and thereon alleges, that each time polluted storm water discharges from the Facility with a pH below 6.5 standard units or above 8.5 standard units, Defendants violate Receiving Water Limitation VI.A of the General Permit and Section 301(a) of the CWA, 33 U.S.C. § 1311(a), to not cause or contribute to an exceedance of an applicable WQS in the Receiving Waters.

160. Plaintiff is informed and believes, and thereon alleges, that storm water samples collected by Defendants on November 8, 2022, had a pH of 6 standard units.

161. Plaintiff is informed and believes, and thereon alleges, that storm water samples collected by Coastkeeper on August 20, 2023, had pH levels of 8.62 or more for each of the two sampling locations.

162. Plaintiff is informed and believes, and thereon alleges, that the Facility further violates the Receiving Water Limitation by causing or contributing to an exceedance of a WQS. *See* CWA 303(d) list, 33 U.S.C. § 1313(d). For example, Bolsa Chica Channel is impaired for pH under the CWA 303(d) list, and the Facility causes or contributes to an exceedance of this WQS by contributing to pH changes in the Bolsa

Chica Channel.

163. Plaintiff is informed and believes, and thereon alleges, that the Facility's discharge violations are ongoing and will continue every time contaminated storm water is discharged from the Facility in violation of the General Permit.

164. Each time discharges of storm water from the Facility cause or contribute to a violation of an applicable WQS is a separate and distinct violation of Receiving Water Limitation VI.A of the General Permit and Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

165. Each time discharges from the Facility adversely impact human health or the environment is a separate and distinct violation of Receiving Water Limitation VI.B of the General Permit and Section 301(a) of the CWA, 33 U.S.C. §1311(a).

**F. Defendants' Non-Storm Water Discharges in Violation of the General Permit and the CWA**

166. Plaintiff is informed and believes, and thereon alleges, that unauthorized non-storm water discharges occur at the Facility due to inadequate BMP development and/or implementation necessary to prevent such discharges.

167. Plaintiff is informed and believes, and thereon alleges, that unauthorized non-storm water discharges are ongoing and will continue until Defendants develop and implement BMPs that will prevent prohibited non-stormwater discharges, or obtain separate NPDES permit coverage.

168. Plaintiff is informed and believes, and thereon alleges, that unauthorized non-storm water discharges occur as a result of industrial materials and equipment being stored outside without adequate cover or containment, and/or cleaning activities being conducted without adequate BMPs.

169. Non-storm water discharges resulting from the activities described above are not from sources that are listed among the authorized non-storm water discharges in Special Conditions and are always prohibited under the General Permit.

### G. Defendants' Violations of the General Permit's SWPPP Requirements

170. The Facility's original SWPPP is publicly available via the SMARTS database and is from August 2016.

171. The Facility's SWPPP was most recently updated in January 2023 and is also publicly available via the SMARTS database.

172. Plaintiff is informed and believes, and thereon alleges, that Defendants have failed and continue to fail to adequately develop, implement, and/or revise a SWPPP, in violation of SWPPP requirements of the General Permit.

173. Plaintiff is informed and believes, and thereon alleges, that the SWPPP for the Facility has the incorrect name for the Facility. The SWPPP refers to the Facility as Custom Pipe & Coupling Co, while the Facility is now called Custom Pipe & Fabrication Inc.

174. Plaintiff is informed and believes, and thereon alleges, that the Facility's Notice of Intent states that 0% of the site is impervious, but the SWPPP states that, "The site is 98% impervious, with roughly 56% of the impervious area consisting of buildings or covered areas. The remaining 2% of the site is comprised of unpaved or landscaped areas that do not impact storm water."

175. Plaintiff is informed and believes, and thereon alleges, that the SWPPP Certification is not signed by the LRP in violation of General Permit, Section II.A.

176. Plaintiff is informed and believes, and thereon alleges, that Section 1.4 of the SWPPP does not include the name of a Consultant/QISP, nor does it name a Facility contact, instead it simply names a SWPPP contact, Greg Torres. Further, the phone number provided for the "Facility Operator" is the same phone number provided for the SWPPP contact, Greg Torres, but the NOI specifically states that the Facility/Operator contact is Todd Kalau, and he has a different phone number than Greg Torres.

177. Plaintiff is informed and believes, and thereon alleges, that Section 1.5 of the SWPPP does not provide detailed information about "procedures to identify alternate team

members to implement the SWPPP and conduct required monitoring when the regularly assigned team members are temporarily unavailable (due to vacation, illness, out of town business, or other absences)" in violation of General Permit, Section X.D.1.

178. Plaintiff is informed and believes, and thereon alleges, that the site map fails to identify material handling and processing areas, waste treatment and disposal areas, dust or particulate generating areas, as well as cleaning or material reuse areas, in violation of General Permit, Section X.E.3.f.

179. Plaintiff is informed and believes, and thereon alleges, that Table 2 in the SWPPP lacks the detail required by Section X.F of the General Permit, meaning Table 2 needs to: (a) Elaborate on what sorts of paints, thinners, solvents, asphalt paint coatings, etc. are used at the Facility; (b) Specify if the location listed in Table 2 is where each material is stored, received, shipped, or handled; (c) Distinguish between typical quantity used/frequency of use at the storage location, receiving and shipping location, and handling location; (d) Elaborate on what "varies" means for frequency of use of Acid PF 135 and Soak 140.

180. Plaintiff is informed and believes, and thereon alleges, that Section 2.2 of the SWPPP does not describe potential pollutant sources with sufficient specificity as required by Section X.G of the General Permit, meaning Section 2.2 needs to: (a) Explain industrial processes at the Facility with greater specificity (*i.e.*, elaborate on what "other metal working processes" are); (b) Specify which industrial materials correlate with which industrial processes; (c) Specify the shipping, receiving, and loading procedures, as well as the spill or leak prevention and response procedures for material handling and storage areas; (d) Include forklift and truck traffic in the Dust and Particulate Generating Activities section as such activities likely do contribute to dust or particulates that may be deposited within the facility boundaries; (e) Explain which pollutants are likely to be present in authorized Non-Storm Water Discharges ("NSWDs"); (f) Explain the degree to which pollutants from different industrial sources may be exposed to, and mobilized by contact with, storm water; (g) Include all sampling, visual observation, and inspection records; (h)

Explain the effectiveness of existing BMPs to reduce or prevent pollutants in industrial storm water discharges and authorized NSWDs, as well as the estimated effectiveness of implementing, to the extent feasible, minimum BMPs to reduce or prevent pollutants industrial storm water discharges and authorized NSWDs; (i) Identify any areas of the facility where minimum BMPs will not adequately reduce or prevent pollutants in storm water discharges, and further, identify any advanced BMPs for those areas.

181. Plaintiff is informed and believes, and thereon alleges, that Section 2.3 of the SWPPP on NSWDs does not specify what sorts of fluids, particulates, or solids could be spilled, nor does it provide an evaluation of where NSWDs could take place and what drainage areas they could lead to, in violation of General Permit, Section X.G.1.e.

182. Plaintiff is informed and believes, and thereon alleges, that Section 2.4 of the SWPPP does not include information on plans for spill cleanup or remedial actions, and preventative measures taken to ensure spills or leaks of materials do not occur, in violation of General Permit, Section X.G.1.d.iii.

183. Plaintiff is informed and believes, and thereon alleges, that Section 3.1.2 of the SWPPP on preventative maintenance does not identify all equipment and systems used outdoors that may spill or leak pollutants, establish a clear schedule for maintenance of identified equipment and systems (saying that something will happen "periodically" is not sufficient), and establish procedures for prompt maintenance and repair of equipment, and maintenance of systems when conditions exist that may result in the development of spills or leaks, all in violation of General Permit, Section X.H.1.b.

184. Plaintiff is informed and believes, and thereon alleges, that Section 3.1.3 of the SWPPP on spill prevention and the emergency cleanup plan does not identify and describe all necessary and appropriate spill and leak response equipment, location(s) of spill and leak response equipment, and spill or leak response equipment maintenance and procedures, as well as identify appropriate spill and leak response personnel, in violation of General Permit, Section X.H.1.c.

185. Plaintiff is informed and believes, and thereon alleges, that the BMP

summary table fails to describe maintenance procedures and/or instructions to implement all BMPs effectively, as well as list equipment and tools necessary to implement all BMPs effectively, in violation of General Permit, Section X.H.4.a.

186. Plaintiff is informed and believes, and thereon alleges, that Defendants have failed to adequately revise the SWPPP in response to ongoing high concentrations of pollutants.

187. Each day the Facility has operated with an inadequately developed, implemented, and/or improperly revised SWPPP is a separate and distinct violation of the General Permit and the CWA.

188. Plaintiff is informed and believes, and thereon alleges, thatDefendants have been in daily and continuous violation of the General Permit's SWPPP requirements since at least July 1, 2019.

### H. Defendants' Violations of the General Permit's Monitoring Implementation Plan Requirements

189. Plaintiff is informed and believes, and thereon alleges, that Defendants have been conducting, and continue to conduct, operations at the Facility with an inadequately developed, implemented, and/or improperly revised MIP, in violation of the MIP requirements of the General Permit.

190. Plaintiff is informed and believes, and thereon alleges, that Defendants have failed and continue to fail to collect storm water discharge samples as required pursuant to Section XI.B.2 of the General Permit, which requires dischargers to collect and analyze storm water samples from two QSEs within the first half of each reporting year and two QSEs within the second half of each reporting year.

191. Plaintiff is informed and believes, and thereon alleges, that in the 2019-2020, 2020-2021, and 2021-2022 reporting years, Defendants collected just two samples per reporting year.

192. Plaintiff is informed and believes, and thereon alleges, that in the 2022-2023 and 2023-2024 reporting years, Defendants collected just one sample per reporting year.

193. Plaintiff is informed and believes, and thereon alleges, that in the 2023-2024 reporting year, Defendants claimed that "[t]he facility was not able to collect the required number of samples due to insufficient discharge and rain events occurring outside of operational hours."

194. Plaintiff is informed and believes, and thereon alleges, that the Facility has not collected the required number of water samples during QSEs in any reporting year within the relevant period.

195. Plaintiff is informed and believes, and thereon alleges, that of the storm water samples that were collected, Defendants failed to timely upload the results to SMARTS within thirty days of receipt, in violation of Section XI.B of the General Permit.

196. Plaintiff is informed and believes, and thereon alleges, that the Facility's reporting erroneously indicates that Defendants were unable to collect the required samples because there were not enough rain events.

197. Climatological data obtained from the National Oceanic and Atmospheric Administration ("NOAA") demonstrates that there were additional opportunities to sample significant rain events during each reporting year. *See* Ex. 2 of Notice Letter attached hereto as Ex. A.

198. Further, Coastkeeper staff observed, documented, and collected samples of discharge from the Facility on an occasion during which the Facility failed to sample – February 24, 2023. *See* Ex. 1 of Notice Letter attached hereto as Ex. A.

199. Plaintiff is informed and believes, and thereon alleges, that the Facility has not always sampled for all pollutants present in its storm water discharge, in violation of Section XI.B of the General Permit. For example, with the singular storm water sample taken during the 2023-2024 reporting year, the Facility neglected to test for pH, TSS, and N+N at SP1, and pH, O&G, aluminum, iron, and zinc at SP2.

200. Defendants' failure to conduct sampling and monitoring as required by the General Permit demonstrates that it has failed to develop, implement, and/or revise a MIP that complies with the requirements of Section XI of the General Permit.

201. Plaintiff is informed and believes, and thereon alleges, that based upon the failure to collect the required number of samples, Defendants have failed and continue to fail to conduct and record adequate visual observations of storm water discharges since at least July 1, 2019, in violation of General Permit, Section XI.A.2.

202. Plaintiff is informed and believes, and thereon alleges, that Defendants have failed and continue to fail to conduct and record all required monthly dry weather visual observations at the Facility.

203. Plaintiff is informed and believes, and thereon alleges, that Defendants have been in ongoing and continuous violation of the General Permit's MIP requirements since at least July 1, 2019.

204. Plaintiff is informed and believes, and thereon alleges, that Defendants are in violation of the General Permit and the CWA because they have failed and continue to fail to adequately develop, implement, and/or revise their MIP in violation of the General Permit's MIP requirements.

**I. Defendants' Violations of the General Permit's Exceedance Response Requirements**

205. Plaintiff is informed and believes, and thereon alleges, that based on storm water sample results submitted by Defendants, the Facility has been in Level 2 status for both zinc and iron from at least the 2018-2019 through the 2023-2024 reporting years.

206. Plaintiff is informed and believes, and thereon alleges, that the Facility was required to (i) prepare and submit a Level 2 ERA Action Plan to SMARTS for iron, and (ii) prepare and submit a Level 2 ERA Technical Report to SMARTS for zinc, both by January 1, 2020.

207. Plaintiff is informed and believes, and thereon alleges, that Defendants' Level 2 ERA Action Plan for iron failed to honestly evaluate the Facility's iron exceedance problem and suggested insufficient modifications such as "considering" the use of a supplemental media vessel and purchasing an industrial vacuum sweeper truck.

208. Plaintiff is informed and believes, and thereon alleges, that the Facility's

Level 2 ERA Action Plan for iron does not comply with the substantive requirements of the ERA Level 2 process in the General Permit, in violation of the General Permit.

209. Plaintiff is informed and believes, and thereon alleges, that the Facility was further required to (i) prepare and submit a Level 2 ERA Technical Report to SMARTS for iron, and (ii) update its Level 2 ERA Technical Report for zinc, both by January 1, 2021.

210. Plaintiff is informed and believes, and thereon alleges, that the Facility timely submitted the Level 2 ERA Technical Report to SMARTS for iron, but it failed to update its Level 2 ERA Technical Report for zinc in violation of the General Permit.

211. Plaintiff is informed and believes, and thereon alleges, that the Facility was further required to update its Level 2 ERA Technical Reports for both zinc and iron following the 2020-2021 reporting year but failed to do so in violation of the General Permit.

212. Plaintiff is informed and believes, and thereon alleges, that the Facility's Level 2 ERA Technical Report again failed to honestly evaluate the Facility's iron exceedance problem and suggested some seemingly vague BMP improvements such as "enact rigorous housekeeping effort to eliminate metal wastes, tire dust, and other solids from exposed surfaces."

213. Plaintiff is informed and believes, and thereon alleges, that the Facility's modifications to its Level 2 ERA Technical Report for iron does not comply with the substantive requirements of the ERA Level 2 process in the General Permit, in violation of the General Permit.

214. Plaintiff is informed and believes, and thereon alleges, that the Facility was not required to update its Level 2 ERA Technical Report for iron following the 2022-2023 reporting year, but it was required to do so for zinc, and the Facility neglected to do so in violation of the General Permit.

215. Plaintiff is informed and believes, and thereon alleges, that the Facility is required to update its Level 2 ERA Technical Reports for both iron and zinc following the

2023-2024 reporting year by January 1, 2025.

216. Plaintiff is informed and believes, and thereon alleges, that based on storm water sample results submitted by Defendants, the Facility triggered Level 1 status for N+N for the 2021-2022 reporting year, stayed in Level 1 for the 2022-2023 reporting year, and was elevated to Level 2 for the 2023-2024 reporting year.

217. Plaintiff is informed and believes, and thereon alleges, that the Facility was required to complete the following tasks for N+N: (i) complete a Level 1 ERA Evaluation by October 1, 2022, (ii) prepare and submit a Level 1 ERA Report to SMARTS by January 1, 2023, and (iii) amend the SWPPP accordingly with revisions uploaded to SMARTS by January 1, 2023.

218. Sampling data obtained by Plaintiff indicate continued, high exceedances of TSS, O&G, aluminum, iron, zinc, and N+N, indicating a failure to comply with the General Permit's requirements to utilize an iterative process for determining and improving BMPs.

219. Plaintiff is informed and believes, and thereon alleges, that Defendants have failed and continue to fail to take Exceedance Response Actions as required by General Permit Section XII.

220. Plaintiff is informed and believes, and thereon alleges, that Defendants have been in daily and continuous violation of the General Permit's Exceedance Response Actions requirements since at least July 1, 2019.

221. Plaintiff is informed and believes, and thereon alleges, that every day the Facility operates without timely submitting and implementing all required ERA documentation is a separate and distinct violation of the General Permit and the CWA, for which Defendants are liable.

**J. Defendants' Failure To Comply With The General Permit's Reporting Requirements**

222. Plaintiff is informed and believes, and thereon alleges, that Defendants have failed and continue to fail to submit Annual Reports that comply with the General Permit's

reporting requirements.

223. Plaintiff is informed and believes, and thereon alleges, that each of Defendants' Annual Reports falsely attribute lack of sampling to lack of rain.

224. Plaintiff is informed and believes, and thereon alleges, that based on climatological data obtained from NOAA, there were additional opportunities to sample significant rain events during each of the reporting years. *See* Ex. 2 of Notice Letter attached hereto as Ex. A.

225. Plaintiff is informed and believes, and thereon alleges, that when Defendants sampled their storm water, sampling results were sometimes uploaded late.

226. Plaintiff is informed and believes, and thereon alleges, that the Facility erroneously certified that all of the information submitted in the Annual Reports was true and correct despite the factual deficiencies detailed in paragraphs 231-233.

227. Plaintiff is informed and believes, and thereon alleges, that Defendants have submitted inaccurate Annual Reports which fail to comply with the General Permit, and as a result, Defendants are in daily violation of the General Permit.

228. Plaintiff is informed and believes, and thereon alleges, that Defendants have been in daily and continuous violation of the General Permit's annual reporting requirements every day since at least July 1, 2019.

229. Every day Defendants conduct operations at the Facility without reporting as required by the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the CWA, 33 U.S.C. §1311(a).

## VI. CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

**Violation of Section 301(a) of the Clean Water Act by Discharging Contaminated Storm Water in Violation of the General Permit's Technology Based Effluent Limitations**

**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

230. Plaintiff incorporates the allegations contained in the above paragraphs as

though fully set forth herein.

231. Plaintiff is informed and believes, and thereon alleges, that Defendants failed and continue to fail to reduce or prevent pollutants associated with industrial activities in its storm water discharges because the Facility has not implemented BMPs that achieve BAT/BCT.

232. Defendants' failure to develop and/or implement BMPs that achieve the pollutant discharge reductions attainable via BAT or BCT at the Facility is a daily and continuous violation of the General Permit and the CWA. General Permit, Section I.D (Finding 32), Effluent Limitation V.A; 33 U.S.C. § 1311(b).

233. Defendants violated, violate, and will continue to violate the General Permit's Technology Based Effluent Limitations each day that the Facility is not implementing BMPs that achieve BAT/BCT standards for discharges of pollutants to waters of the United States from the Facility.

234. Plaintiff is informed and believes, and thereon alleges, that Defendant Stanton Partnership has a lease agreement with Shapco and Custom Pipe that requires compliance with all applicable laws, regulations, and other provisions to inspect the property, giving it knowledge and control over the errors and omissions giving rise to the violations alleged herein, and is consequently liable under the Clean Water Act. Further, Plaintiff is informed and believes, and thereon alleges, that Jerry A. Witkow, located at 1666 20th Street, Suite 100, Santa Monica, CA 90404, is the agent for service of process for Stanton Partnership, Custom Pipe, and Shapco, which indicates that Stanton Partnership may share other corporate officers with Custom Pipe and Shapco, thus giving Stanton Partnership knowledge and control over the acts and omissions giving rise to the violations alleged in this complaint.

235. Plaintiff is informed and believes, and thereon alleges, that Defendants violated the Effluent Limitations of the General Permit and the Clean Water Act within the applicable statute of limitations, and such violations are ongoing and continuous.

236. Plaintiff is informed and believes, and thereon alleges, that Defendants' acts

and omissions described herein constitute violations of individual terms of the General Permit, compliance with which is required to lawfully discharge pollutants to waters of the United States.

237. Plaintiff alleges that its members have been harmed by Defendants' acts and omissions described herein and have standing to bring this suit.

238. Each and every violation of the General Permit Effluent Limitations is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

239. By committing the acts and omissions alleged above, Defendants are subject to an assessment of civil penalties for each and every violation of the CWA occurring from July 1, 2019 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

240. An action for injunctive relief is authorized by CWA Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which harm Plaintiff and citizens have no plain, speedy, or adequate remedy at law.

241. An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

## SECOND CAUSE OF ACTION

**Defendants' Discharges of Contaminated Storm Water in Violation of the General Permit's Receiving Water Limitations and the Clean Water Act**

**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

242. Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

243. Plaintiff is informed and believes, and thereon alleges that, within the applicable statute of limitations, discharges of storm water containing levels of pollutants that adversely impact human health and/or the environment occur each time storm water discharges from the Facility.

244. Plaintiff is informed and believes, and thereon alleges that, within the

applicable statute of limitations, storm water containing levels of pollutants that cause or contribute to exceedances of water quality standards, such as the CTR and the WQS described in the Santa Ana Basin Plan, have, and continue to be, discharged each time storm water discharges from the Facility.

245. Plaintiff is informed and believes, and thereon alleges, that Defendants' acts and omissions described herein constitute violations of individual terms of the General Permit, compliance with which is required to lawfully discharge pollutants to waters of the United States.

246. Plaintiff alleges that its members have been harmed by Defendants' acts and omissions described herein and have standing to bring this suit.

247. Defendants violated, violate, and will continue to violate the General Permit Receiving Water Limitations each and every time storm water containing levels of pollutants that adversely impact human health and/or the environment, and that cause or contribute to exceedances of WQS, discharges from the Facility.

248. Plaintiff is informed and believes, and thereon alleges, that Defendants have violated, violate, and continue to violate, the Receiving Water Limitations of the General Permit and the CWA within the applicable statute of limitations, and that such violations are ongoing and continuous.

249. Each and every violation, within the applicable statute of limitations, of the General Permit Receiving Water Limitations is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

250. By committing the acts and omissions alleged above, Defendants are subject to an assessment of civil penalties for each and every violation of the CWA occurring from July 1, 2019, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

251. An action for injunctive relief under the Clean Water Act is authorized by Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California,

for which harm Plaintiff and citizens have no plain, speedy, or adequate remedy at law.

252. An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

**THIRD CAUSE OF ACTION**

**Defendants' Discharges of Non-Storm Water in Violation of the General Permit and the CWA**

**U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

253. Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

254. Plaintiff is informed and believes, and thereon alleges that, within the applicable statute of limitations, prohibited non-storm water discharges have discharged and continue to discharge from the Facility, in violation of the General Permit and CWA Section 301(a). 33 U.S.C. § 1311(a).

255. Plaintiff is informed and believes, and thereon alleges, that Defendants violated the Discharge Prohibitions of the General Permit, within the applicable statute of limitations, and such violations are ongoing and continuous.

256. Plaintiff is informed and believes, and thereon alleges, that Defendant Stanton Partnership has a lease agreement with Shapco and Custom Pipe that requires compliance with all applicable laws, regulations, and other provisions to inspect the property, giving it knowledge and control over the errors and omissions giving rise to the violations alleged herein, and is consequently liable under the Clean Water Act. Further, Plaintiff is informed and believes, and thereon alleges, that Jerry A. Witkow, located at 1666 20th Street, Suite 100, Santa Monica, CA 90404, is the agent for service of process for Stanton Partnership, Custom Pipe, and Shapco, which indicates that Stanton Partnership may share other corporate officers with Custom Pipe and Shapco, thus giving Stanton Partnership knowledge and control over the acts and omissions giving rise to the violations alleged in this complaint.

257. Each and every violation within the applicable statute of limitations of the

General Permit's Discharge Prohibitions is a separate and distinct violation of Section 301(a) of the CWA. 33 U.S.C. § 1311(a).

258. By committing the acts and omissions alleged above, Defendants are subject to an assessment of civil penalties for each and every violation of the CWA occurring from July 1, 2019, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

259. An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which harm Plaintiff and citizens have no plain, speedy, or adequate remedy at law.

260. An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

## FOURTH CAUSE OF ACTION

**Defendants' Failure to Adequately Develop, Implement, and/or Revise a Storm Water Pollution Prevention Plan in Violation of the General Permit and the Clean Water Act**

**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

261. Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

262. Plaintiff is informed and believes, and thereon alleges, within the applicable statute of limitations, that Defendants have failed and continue to fail to develop an adequate SWPPP for the Facility, in violation of the General Permit.

263. Plaintiff is informed and believes, and thereon alleges, within the applicable statute of limitations, that Defendants have failed and continue to fail to adequately implement the SWPPP for the Facility, in violation of the General Permit.

264. Plaintiff is informed and believes, and thereon alleges, within the applicable statute of limitations, that Defendants have failed and continue to fail to adequately revise the SWPPP for the Facility, in violation of the General Permit.

265. Defendants have been in violation of the General Permit at the Facility every day from July 1, 2019, to the present.

266. Defendants' violations of the General Permit and the CWA at the Facility are ongoing and continuous.

267. Defendants will continue to be in violation of the General Permit and the CWA each and every day Defendants fail to adequately develop, implement, and/or revise the SWPPP for the Facility.

268. Plaintiff is informed and believes, and thereon alleges, that Defendants' acts and omissions described herein constitute violations of individual terms of the General Permit, compliance with which is required to lawfully discharge pollutants to waters of the United States.

269. Plaintiff alleges that its members have been harmed by Defendants' acts and omissions described herein and have standing to bring this suit.

270. Each and every violation of the General Permit SWPPP requirements at the Facility is a separate and distinct violation of the CWA.

271. By committing the acts and omissions alleged above, Defendants are subject to an assessment of civil penalties for each and every violation of the CWA occurring from July 1, 2019, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

272. An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which harm Plaintiff and citizens have no plain, speedy, or adequate remedy at law.

273. An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

**FIFTH CAUSE OF ACTION**

**Defendants' Failure to Adequately Develop, Implement, and/or Revise a Monitoring Implementation Plan in Violation of the General Permit and the Clean Water Act**

**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

274. Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

275. Plaintiff is informed and believes, and thereon alleges, that Defendants have failed and continue to fail to collect storm water discharge samples as required by the General Permit. During the statute of limitations, Defendants were required to sample their storm water during 20 QSEs, but in actuality, Defendants only sampled during eight QSEs.

276. Plaintiff is informed and believes, and thereon alleges, that Defendants have failed and continue to fail to conduct and record adequate visual observations of storm water discharges during those same QSEs.

277. Plaintiff is informed and believes, and thereon alleges, that Defendants have failed and continue to fail to conduct and record all required monthly dry weather visual observations at the Facility.

278. Plaintiff is informed and believes, and thereon alleges, within the applicable statute of limitations, that Defendants have failed and continue to fail to develop an adequate MIP for the Facility, in violation of the General Permit.

279. Plaintiff is informed and believes, and thereon alleges, within the applicable statute of limitations, that Defendants have failed and continue to fail to adequately implement the MIP for the Facility, in violation of the General Permit.

280. Plaintiff is informed and believes, and thereon alleges that, within the applicable statute of limitations, Defendants have failed and continue to fail to adequately revise the MIP for the Facility, in violation of the General Permit.

281. Defendants have been in violation of the General Permit monitoring requirements at the Facility every day from July 1, 2019, to the present.

282. Defendants' violations of the General Permit monitoring requirements and the CWA at the Facility are ongoing and continuous.

283. Defendants will continue to be in violation of Section XI of the General Permit and the CWA each and every day they fail to adequately develop, implement, and/or revise the MIP for the Facility.

284. Plaintiff is informed and believes, and thereon alleges, that Defendants' acts and omissions described herein constitute violations of individual terms of the General Permit, compliance with which is required to lawfully discharge pollutants to waters of the United States.

285. Plaintiff alleges that its members have been harmed by Defendants' acts and omissions described herein and have standing to bring this suit.

286. Each and every violation of the General Permit MIP requirements at the Facility is a separate and distinct violation of the CWA.

287. By committing the acts and omissions alleged above, the Defendants are subject to an assessment of civil penalties for each and every violation of the CWA occurring from July 1, 2019, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

288. An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which harm Plaintiff and citizens have no plain, speedy, or adequate remedy at law.

289. An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

**SIXTH CAUSE OF ACTION**

**Defendants' Failure to Satisfy Exceedance Response Requirements in Violation of the General Permit and the Clean Water Act**

**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

290. Plaintiff incorporates the allegations contained in the above paragraphs as

though fully set forth herein.

291. Plaintiff is informed and believes, and thereon alleges, that Defendants have failed and continue to fail to take Exceedance Response Actions as required by General Permit Section XII.

292. Plaintiff is informed and believes, and thereon alleges, that Defendants have failed to submit required ERA documentation during the applicable statute of limitations.

293. Plaintiff is informed and believes, and thereon alleges, that even when Defendants did submit certain required ERA documentation during the applicable statute of limitations, such documentation failed to comply with requirements set out within the General Permit and CWA.

294. Plaintiff is informed and believes, and thereon alleges, that Defendants have been in daily and continuous violation of the General Permit's Exceedance Response Actions requirements since at least July 1, 2019.

295. By committing the acts and omissions alleged above, the Defendants are subject to an assessment of civil penalties for each and every violation of the CWA occurring from July 1, 2019, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

296. An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which harm Plaintiff and citizens have no plain, speedy, or adequate remedy at law.

297. An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

## SEVENTH CAUSE OF ACTION

**Defendants' Failure to Report as Required by the General Permit in Violation of the General Permit and the Clean Water Act**

**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

298. Plaintiff incorporates the allegations contained in the above paragraphs as

though fully set forth herein.

299. Plaintiff is informed and believes, and thereon alleges that, within the applicable statute of limitations, Defendants' Annual Reports failed to meet the requirements of Section XVI.B of the General Permit.

300. Plaintiff is informed and believes, and thereon alleges that, within the applicable statute of limitations, Defendants' Annual Reports erroneously certified compliance with the General Permit.

301. Plaintiff is informed and believes, and thereon alleges, that of the storm water samples Defendants collected, Defendants failed to timely upload the results to SMARTS within thirty days of receipt.

302. Plaintiff is informed and believes, and thereon alleges, that Defendants' acts and omissions described herein constitute violations of individual terms of the General Permit, compliance with which is required to lawfully discharge pollutants to waters of the United States.

303. Plaintiff alleges that its members have been harmed by Defendants' acts and omissions described herein and have standing to bring this suit.

304. Defendants' violations of the reporting requirements of the General Permit and the CWA are ongoing and continuous.

305. By committing the acts and omissions alleged above, Defendants are subject to an assessment of civil penalties for each and every violation of the CWA occurring from July 1, 2019, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

306. An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which harm Plaintiff and citizens have no plain, speedy, or adequate remedy at law.

307. An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

## VII. RELIEF REQUESTED

308. Plaintiff respectfully requests that this Court grant the following relief:

a. A Court order declaring that the Defendants have violated, and continue to be in violation, of Sections 301(a) and (b) of the Clean Water Act, 33 U.S.C. §§ 1311(a) and (b), for discharging pollutants from the Facility in violation of a permit issued pursuant to Section 402(p) of the CWA, 33 U.S.C. § 1342(p), for failing to meet effluent limitations which include BAT/BCT requirements, for failing to meet receiving water limitations, for failing to develop and implement an adequate SWPPP, for failing to comply with the monitoring provisions of the General Permit, for failing to submit accurate annual reports, for failing to timely submit ERA documentation, and for failing to comply with the substantive and procedural requirements of the General Permit;

b. A Court order enjoining Defendants from discharging pollutants in violation of an NPDES permit;

c. A Court order requiring Defendants to implement affirmative injunctive measures designed to eliminate Defendants' violations of the substantive and procedural requirements of the General Permit and the Clean Water Act;

d. A Court order assessing civil monetary penalties for each violation of the CWA at $66,712 per day per violation. *See* 33 U.S.C. §§ 1319(d) and 1365(a); Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4;

e. A Court order awarding Plaintiff its reasonable costs of suit, including attorneys', witness', experts', and consultants' fees, as permitted by Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d); and

f. Any other relief as this Court may deem appropriate.

Dated: August 30, 2024

Respectfully submitted,

/s/ Erin A. Barlow
Erin A. Barlow
Attorney for Plaintiff
Orange County Coastkeeper